UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RBG MANAGEMENT CORP.,<br><br>                              Plaintiff,<br><br>            -against-<br><br>VILLAGE SUPER MARKET, INC.,<br><br>                              Defendant. | Case No. 1:22-cv-07996 (JLR)<br><br>**<u>OPINION AND ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

        Plaintiff RBG Management Corporation, a New York corporation doing business as

Morton Williams Supermarkets ("Morton Williams" or "Plaintiff"), brings this action against

Defendant Village Super Market, Inc., a New Jersey corporation ("Village" or "Defendant"),

alleging that Village has committed the following torts: (1) tortious interference with a contract;

(2) tortious interference with economic relations and prospective economic relations; (3) unfair

competition; and (4) unjust enrichment, seeking compensatory and punitive damages, as well as

restitution and disgorgement.  *See* ECF No. 1 ("Compl.").  Now before the Court is Defendant's

motion to dismiss the Complaint in its entirety for failure to state a claim, *see* ECF Nos. 18

("Br."), 25 ("Reply"), which Plaintiff opposes, *see* ECF No. 22 ("Opp.").  For the reasons set

forth herein, the motion is GRANTED in part and DENIED in part.

**BACKGROUND[1]**

        Plaintiff Morton Williams is a grocery business that has operated supermarkets in New

York City for over seventy years.  Compl. ¶ 14.  Part of its "favorable and valuable reputation"

---

[1] Unless otherwise noted, the facts stated herein are from the Complaint, which the Court accepts
as true, and from material referenced in the Complaint.  *See In re Amaranth Nat. Gas
Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013); *DiFolco v. MSNBC Cable LLC*, 622 F.3d
104, 110-11 (2d Cir. 2010).  The agreement between Wakefern and Morton Williams is

in New York comes from its "high-quality grocery products," including "high-quality private-label products," that it has sold since 2008. *Id.* ¶¶ 14-15. Of its 16 grocery stores, 14 are located in Manhattan. *Id.* ¶ 15. Defendant Village also operates a supermarket chain, which largely consists of ShopRite grocery stores across New Jersey, Pennsylvania, and Maryland. *Id.* ¶ 17. Since 2019, Village has operated four "specialty markets" under the name Gourmet Garage, and since 2020, Village has operated five "Fairway Markets," all in Manhattan. *Id.*

Village is a member of Wakefern Food Corporation ("Wakefern"), a "retailer-owned cooperative that supplies Wakefern Private-Label Products to grocery stores." *Id.* ¶¶ 1-2, 29. In fact, Village is the "second largest member of Wakefern," owning 12.2% of outstanding stock as of July 31, 2021. *Id.* ¶ 59. Private-label grocery products are not promoted by third-party manufacturers, but instead are marketed as a grocery store's own product. *Id.* ¶ 21. According to the Complaint, since the mid-to-late 2000s, consumers have demonstrated a willingness to pay for quality products, rather than seek low prices. *Id.* ¶ 22. Brand-name manufacturers began to see their profits increase, but given that a large "cut" of the sales went to the brand-name manufacturer, the grocery stores' net profitability on those items decreased. *Id.* ¶ 23. Grocery stores responded by partnering with suppliers under arrangements where the grocery store would market private-label goods as their own. *Id.* In Manhattan especially, competition from grocery chains like Trader Joe's and Whole Foods, "whose primary business model is the sale of private-label products," also meant that stores would need to increase their own private-label offerings. *Id.* ¶ 24. For smaller grocery chains in particular, this meant entering "comprehensive supply contract[s]," and assisting with the promotion and development of a customer base for those

---

referenced in the Complaint. *See, e.g.*, Compl. ¶ 39; *see also* ECF No. 18-4 ("2019 Supply Agreement").

products. *Id.* ¶¶ 25-26. These stores then benefited from having "a well-regarded private-label product line associated with their stores." *Id.* ¶ 27.

Prior to 2008, Wakefern had not had much success marketing or selling its private-label products in Manhattan. *See id.* ¶¶ 29-30. In 2008, Morton Williams decided that it needed to sell private-label products and entered into an agreement with Wakefern to sell Wakefern's private-label products under the ShopRite label in its stores. *Id.* ¶ 28. Morton Williams, at the time, "had an established reputation as an upscale grocery store" in Manhattan, and therefore was in a position to successfully change the perception of Wakefern private-label products (ShopRite products) in the market. *See id.* ¶¶ 32-33. Between 2008 and 2018, Morton Williams invested "time, money, floor space, and advertising space in promoting" the private-label products, and was able to establish the ShopRite brand as representing high-quality goods at a lower price point than similar brand-name items. *Id.* ¶ 34. Morton Williams assisted Wakefern's business by providing competitive information about consumer preferences, and by "create[ing] a marketplace for" the private-label products. *Id.* ¶¶ 35-37. Wakefern's business eventually expanded, and it "upgrad[ed]" its products to include private-label brands "Bowl & Basket," "Paperbird," and "Wholesome Pantry." *Id.* ¶ 37. Wakefern discussed its approach to these upgrades with Morton Williams, and the two entities "strategized together about how Morton Williams could help promote those products in the coming years." *Id.* ¶ 38.

Morton Williams and Wakefern had entered into supply agreements since 2008, and, in 2019, they agreed to a longer-term supply agreement ("2019 Supply Agreement"). *Id.* ¶¶ 39, 44. The 2019 Supply Agreement provided that Wakefern would pay Morton Williams a "Private Label Fund" and warranted that its private-label goods would meet particular specifications. *Id.* ¶ 46. The 2019 Supply Agreement extended until May 6, 2024, with automatic renewals for

twelve-month periods thereafter, unless either party terminated under the grounds set forth in the agreement.  *Id.* ¶ 47.

The 2019 Supply Agreement provided that "[t]he Categories" of goods "included in [the] Agreement . . . are set forth in Appendix 1, which may be amended by the Parties from time to time to add additional Categories."  2019 Supply Agreement § 1(c).  It also defined the term "Product(s)" to mean "those products set forth in Appendix 1 as Wakefern may amend from time to time," and "Wakefern Product(s)" as "each and every product sold or offered for sale by Wakefern included in any Category, including without limitation, new goods or products as may be introduced from time to time."  *Id.* §§ 1(e), 1(g).  The agreement further provided that "Wakefern may, in its sole discretion, accept or reject any order."  *Id.* § 4(b).

Since that agreement was signed, Morton Williams contends that – even in the face of the COVID-19 pandemic, which caused many consumers to leave Manhattan – the profitability of the private-label products significantly increased.  *Id.* ¶ 41; *see id.* ¶ 42 (discussing private-label products when Morton Williams was ranked as one of the "5 Best Supermarkets in New York"); *see also id.* ¶ 49 (alleging that "[w]ith Wakefern's Private-Labels Products having been popularized in Manhattan through the promotional efforts of Morton Williams, and associated in customers' minds with Morton Williams, both Wakefern and Morton Williams were well placed to keep profiting from this surge in consumer demand for high-end private-label grocery products in Manhattan").

After Village acquired the Gourmet Garage and Fairway Market stores in Manhattan in 2019 and 2020, Morton Williams alleges that the stores began to compete for business due to the proximity of Village's stores to Morton Williams's stores.  *See* Compl. ¶¶ 51-54.  Village's stores, however, struggled throughout the COVID-19 pandemic, and Village decided to abandon

the previous private-label products that Fairway sold.  *Id.* ¶¶ 55-56.  Village further knew that Wakefern's supply arrangement with Morton Williams "was thriving and sales were growing." *Id.* ¶ 57.  As a significant member of Wakefern, Village was also supplied with Wakefern's ShopRite private-label products.  *Id.* ¶ 59.  Morton Williams, a healthy – and threatening – competitor of Village, was not a member of Wakefern.  *Id.* ¶ 59; *see id.* ¶¶ 57-58, 62 (discussing competitive threat).  Morton Williams alleges that Village exerted direct influence over Wakefern via shareholder voting power, its presence on Wakefern's Board of Directors and committees, and because Village provided so much funding to Wakefern.  *Id.* ¶¶ 60-61 (alleging that Village must purchase a minimum of 85% of its product requirements from Wakefern). Using this influence, Village allegedly caused Wakefern to breach the 2019 Supply Agreement by refusing to supply further private-label products to Morton Williams.  *Id.* ¶ 63.

Morton Williams alleges that it learned of this breach on February 21, 2022, when a representative from Wakefern met with Morton Williams.  *Id.* ¶¶ 64, 66.  At the meeting, the senior Wakefern representative "abruptly announced . . . that Morton Williams had 90 days to stop buying Wakefern Private-Label Products and that, after that date, Wakefern would no longer accept Morton Williams' orders for those products."  *Id.* ¶ 66.  When pressed, the Wakefern representative "explained that Wakefern had been compelled [to make this decision] by Village" when it decided to stop selling the Fairway private-label products, and did not want to compete with Morton Williams in its sale of the same Wakefern private-label products.  *Id.* ¶¶ 68-69.  The representative also said that the Wakefern Board of Directors, on which Village's Co-President, Nicholas Sumas, is a member, voted to stop selling the Wakefern private-label products to Morton Williams "at Village's behest."  *Id.* ¶ 70.

Morton Williams contends that this decision breached the 2019 Supply Agreement. *Id.* ¶ 71. It further alleges that, but for Village's "exercise of . . . pressure" over the Wakefern Board, the 2019 Supply Agreement would have continued, and Morton Williams would have continued to purchase the Wakefern private-label products indefinitely. *Id.* ¶¶ 71-72. Despite "repeated efforts" to proceed with business as they had been, Wakefern refused to change its mind. *Id.* ¶ 74. Morton Williams provided Wakefern with a notice of breach of the 2019 Supply Agreement on July 5, 2022. *Id.* ¶ 75.

Morton Williams contends that, as a result of the breach, Wakefern has sustained "severe and continuing" damages, including the costs for replacing its supplier, heightened private-label product costs from other suppliers, loss of sales and profits, loss of the value of investment that Morton Williams put into "promoting Wakefern private labels," and "the costs of promoting and popularizing new private labels." *Id.* ¶ 77; *see also* ¶¶ 78-82 (detailing damages over ten million dollars). Morton Williams further contends that "Village will now be able to expropriate Morton Williams customers who had become loyal to the Wakefern labels as a result of Morton William's investments and labor." *Id.* ¶¶ 83-84. Finally, Morton Williams contends that Village's actions harm the public because Village will charge higher prices than Morton Williams did for the same products, without any competition, and those brands will be available at fewer locations in Manhattan. *Id.* ¶ 85.

Morton Williams commenced this action on September 19, 2022. *See generally* Compl. The parties stipulated to a briefing schedule for Village's motion to dismiss, and briefing was fully submitted on January 26, 2023.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)).  The court draws all reasonable inferences in the plaintiff's favor, and accepts as true all non-conclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In making this determination, a court is generally limited to the "facts stated on the face of the complaint," as well as "documents appended to the complaint or incorporated in the complaint by reference," "matters of which judicial notice may be taken," and documents "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal citations omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (internal citation and quotation marks omitted)).  Finally, "[w]hile the Court must accept the facts as alleged in the complaint, 'when any allegations contradict the evidence contained in the

documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true.'" *Zoulas v. N.Y. City Dep't of Educ.*, 400 F. Supp. 3d 25, 48 (S.D.N.Y. 2019) (quoting *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002)).

## DISCUSSION

Plaintiff brings claims for (1) tortious interference with a contract, (2) tortious interference with economic relations and prospective economic relations, (3) unfair competition, and (4) unjust enrichment. *See* Compl. ¶¶ 86-120. The Court will address each of Plaintiff's claims, and Defendant's arguments for dismissal of those claims, in turn.

### I.     Tortious Interference with Contract

Plaintiff first claims that Village tortiously interfered with its 2019 Supply Agreement with Wakefern by inducing Wakefern to breach the contract and stop providing Plaintiff with private-label products. Compl. ¶¶ 86-94. To allege a claim for tortious interference with contract under New York law, a plaintiff must plead "the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). Village moves to dismiss this claim, arguing that it acted to protect its economic interests in Wakefern, and therefore cannot be liable for inducing Wakefern's alleged breach, and alternatively, that Wakefern did not actually breach the 2019 Supply Agreement. *See* Br. at 10-16. Both arguments fail at this stage of the litigation.

### A.     Economic Interest Defense

"In developing the contours of [the tort of tortious interference with contract], the New York courts have sought 'to strike a balance between two valued interests: protection of enforceable contracts, which lends stability and predictability to parties' dealings, and promotion

of free and robust competition in the marketplace.'" *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29 (S.D.N.Y. 2017) (quoting *White Plains Coat & Apron Co., Inc.*, 8 N.Y.3d at 425), *aff'd*, 712 F. App'x 85 (2d Cir. 2018).  As part of that balance, New York courts have recognized an "economic interest defense" that may apply to claims for tortious interference with a contract in certain circumstances.  *Id.*  "The defense applies when the defendant 'acted to protect its own legal or financial stake in the breaching party's business.'" *Id.* (quoting *White Plains Coat & Apron Co., Inc.*, 8 N.Y.3d at 426); *see also Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996) ("[P]rocuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong.'" (quoting *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969))).  A plaintiff may overcome the defense only if the defendant acted out of "malice on the one hand," or used "fraudulent or illegal means on the other."  *Foster*, 87 N.Y.2d at 750.

The New York Court of Appeals has explained that the defense will generally apply in situations where "defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff."  *White Plains Coat & Apron Co.*, 8 N.Y.3d at 426.  In *Felsen*, for example, the New York Court of Appeals concluded that the defense applied when the defendant, who was the sole stockholder of the breaching company, was alleged to have intentionally interfered with the plaintiff's contract with the breaching company.  24 N.Y.2d at 686.  The Court concluded that the defendant "had an existing economic interest in the affairs" of the breaching party, and absent evidence that it was motivated by "malice," or that it employed illegal means, the defense applied.  *Id.* at 687; *see*

*also Foster*, 87 N.Y. 2d at 751 (concluding that defense applied where the defendants, who were founders and stockholders of breaching company, "were clearly acting in the economic interest" of the company "to preserve [its] financial health" prior to insolvency); *Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 15 (2d Cir. 2002) (noting that defense applies where the stockholder was "acting . . . to protect *its own economic interest* in that breaching party"). However, "[a] defendant who is simply [a] plaintiff's competitor and knowingly solicits its contract customers is not economically justified in procuring the breach of contract." *White Plains Coat & Apron Co*., 8 N.Y.3d at 426.

"[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Therefore, if the complaint, on its face, "supports a defendant's economic interest in the breaching party's business," *Benihana of Tokyo*, 259 F. Supp. 3d at 29, in addition to pleading the elements of tortious interference, "[t]he plaintiff must also adequately allege that the defendant either acted maliciously, fraudulently, or illegally," *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009). If the economic interest defense cannot be determined based on the pleadings alone, and the plaintiff has otherwise adequately alleged the claim, then dismissal is inappropriate. *See Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 350 (S.D.N.Y. 2013).

Here, the Court is unable to conclude based on the pleadings alone that Village is entitled to the economic interest defense. Per the allegations in the Complaint, Village has some economic interest in Wakefern. Morton Williams specifically alleges that, as of July 31, 2021, Village owned "12.2%" of outstanding stock in Wakefern, making it the "second largest member of Wakefern." Compl. ¶ 59. As Village points out, "New York state case law . . . has

consistently found that the economic interest defense is available to defendants who are stockholders in the breaching party's business." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18-cv-04044 (VM), 2019 WL 4744220, at *9 (S.D.N.Y. Aug. 26, 2019) (collecting cases); *see also* Br. at 11-13.

Complicating matters, however, are Morton Williams's allegations that suggest that Village was acting against its financial interests in Wakefern, and instead acting to promote Village's own, independent financial interests. *See* Opp. at 7-11. Specifically, Morton Williams alleges that Wakefern's financial interests aligned with its own (not with Village's) because of the success of Wakefern's business relationship with Morton William. *See* Compl. ¶¶ 34-35, 41 (alleging that, from 2008 to 2018, Morton Williams increased the popularity, and therefore profits, of Wakefern private-label products); ¶ 38 (alleging Morton Williams and Wakefern "strategized together" about promotion and selling of Wakefern private-label products); ¶ 44 (alleging series of contracts entered into between Morton Williams and Wakefern); ¶¶ 45-47 (alleging Wakefern drafted the five-year 2019 Supply Agreement, which was long-term compared to prior contracts); ¶ 48 (alleging economic benefits of Wakefern and Morton Williams arrangement were "set to keeping growing"). Thus, according to the Complaint, Village acted contrary to its financial interest in *Wakefern's* growing success when it exerted pressure on Wakefern to breach the 2019 Supply Agreement. Rather, Village was acting to further its own, independent financial interests to eliminate Morton Williams as competition for Wakefern's Shop-Rite private-label products. *See* Compl. ¶¶ 51-54, 57-63. The Complaint therefore alleges that Village was not acting to protect its interests in Wakefern, but instead was motivated to remove a competitor from the market in order to increase its own profits. *See Balance Point Divorce Funding, LLC*, 978 F. Supp. 2d at 350 (concluding economic interest

defense did not appear on the face of the complaint where the complaint alleged that the defendant had an "alternative motivation" – a "desire to prevent [the plaintiff] from gaining shares of [the defendant's] stock").

Village counters that, in light of Wakefern's by-laws, it is clear from the allegations in the Complaint that Village was acting to protect its interest in Wakefern. *See* Reply at 2-4; Br. at 12-14. Specifically, Village contends that Wakefern's by-laws provide that the Wakefern cooperative's benefits – including to "purchase and receive merchandise and services from Wakefern for sale or use in connection with an establishment other than a Wakefern Branded Store" – are "exclusive to Wakefern members." Br. at 12 (quoting ECF No. 18-3 ("Wakefern By-Laws") Art. XII § 1(d)). Village further argues that the by-laws provide that non-members may not "receive any merchandise or services, or use the ShopRite trademark, if doing so places a Wakefern member at a competitive disadvantage." Reply at 4 (citing to Wakefern By-Laws, Article XII, § 1(d)). Therefore, Village was acting in Wakefern's interest, by ensuring that Wakefern adhered to its own by-laws, when Village sought to end the ShopRite private-label goods from being sold to Morton Williams (a non-Wakefern member) based on competition with Village (a Wakefern member). *See* Br. at 12-14; Reply at 2-4.

The by-laws are not specifically referenced in the Complaint and Morton Williams argues that Village's interpretation of the by-laws is incorrect and otherwise contradicted by the Complaint. *See* Opp. at 9-10. Even considering the by-laws, at this stage, the Court cannot conclude that the economic interest defense is clear at the pleadings stage. The by-laws permit sales to non-members, stating "persons who are approved by the Board of Directors or who meet criteria established by the Board of Directors from time to time may receive merchandise and

12

services from Wakefern on such terms and conditions as may be approved by the Board or its designees." Wakefern By-Laws Art. XII § 1(b).

Rather than blanketly prohibiting Wakefern from selling merchandise to a competitor of a member, as Village suggests, section 1(d) of Article XII qualifies that an entity may not "purchase and receive merchandise and services from Wakefern" unless the Board determines that it would not place a Wakefern Branded Store or a member "at a competitive disadvantage through access by the non-Wakefern trademarked store (or its management) [which would include a non-member] to competitively significant and/or confidential information and/or services provided by Wakefern to its [members] operating Wakefern Branded Stores." Whether the 2019 Supply Agreement placed Village at a competitive disadvantage because Morton Williams gained access to the requisite "competitively significant and/or confidential information and/or services" is unclear.

Therefore, contrary to Village's arguments, it is not clear from the by-laws that it is necessarily in Wakefern's interest to promote a Wakefern member's interests over those of a competing non-member – particularly where Wakefern's relationship with the non-member was highly profitable to Wakefern, as the Complaint alleges. Viewing those allegations in the light most favorable to Morton Williams, as the Court must do at this juncture, "the economic interest defense is not yet available to [Village] because" Morton Williams has "not alleged that [Village's] interference with the contract between [Morton Williams] and [Wakefern] was for anyone's benefit other than [Village's] own." *Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-cv-07742 (JPO), 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018); *see U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98-cv-03099 (JGK), 2001 WL 300735, at *24 (S.D.N.Y. Mar. 27, 2001) (denying motion to dismiss on grounds of economic interest defense where "it

cannot be determined on this motion to dismiss whether [defendant] acted out of its own economic justification and whether the [plaintiff] will be able to overcome any such defense"); *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11-cv-05832 AJN, 2012 WL 3542196, at *9 (S.D.N.Y. Aug. 15, 2012) (collecting cases refusing to apply the defense at the pleading stage). Accordingly, the Court rejects Village's argument that Morton Williams's claim for tortious interference with a contract should be dismissed based on the economic interest defense.

### B.    Breach of Underlying Contract

Village next argues that the tortious interference with contract claims should be dismissed because the Complaint makes only "conclusory allegations" that Wakefern breached the 2019 Supply Agreement, and does not cite to a specific provision of the 2019 Supply Agreement that was breached. Br. at 14-16 (citing, among other authorities, *Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached.")). Village also claims that Wakefern did not breach the contract because it was permitted to refuse orders from Morton Williams or amend the products available to them, which is what Wakefern has done, and Wakefern was willing to continue to sell non-private-label products to Morton Williams. *See id.* at 15-16. In response, Morton Williams argues that Wakefern's refusal to sell them private-label products was a clear breach of the 2019 Supply Agreement (and, it contends, the implied covenant of good faith and fair dealing), because the contract provisions do not unambiguously provide the right for Wakefern to act in the manner that it has here. *See* Opp. at 13-16. The Court concludes that, at least at this stage, Morton Williams has adequately alleged a breach of contract.

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015)). The Complaint alleges that in 2019, Morton Williams and Wakefern "entered into a long-term supply agreement . . . which, among other things, enabled Morton Williams to purchase Private-Label Products" from Wakefern. Compl. ¶ 39. The Complaint further alleges that the parties were performing under that contract until February 21, 2022, when a Wakefern representative informed Morton Williams that, after 90 days, it "would no longer accept Morton Williams' orders" for the private-label products. *Id.* ¶¶ 64, 66. Morton Williams further contends that it sent Wakefern a notice of breach, and was damaged by this decision. *Id.* ¶¶ 75, 77-85.

The Court does not agree with Village's contention that the unambiguous language of the 2019 Supply Agreement demonstrates that Wakefern's alleged refusal to sell Morton Williams private-label products through the end of the contract term was not a breach of contract. The 2019 Supply Agreement provides that Morton Williams "may purchase from Wakefern and Wakefern may sell to Purchasers the Products and Services described in Appendix 1 pursuant to the terms and conditions set forth in this Agreement." 2019 Supply Agreement § 3(a). The parties do not dispute that the private-label products in dispute here are encompassed in Appendix 1.

In contending that Wakefern did not breach the agreement, Village points to the contractual provision that states that "Products" are defined as "those products set forth in Appendix 1 as Wakefern may amend from time to time." *Id.* § 1(e). Village also contends that there can be no breach of contract because the "Order Procedure" in the contract provides that

"Wakefern may, in its sole discretion, accept or reject any order." *Id.* § 4(b). Thus, Village argues that Wakefern did nothing more than "amend" the products that Morton Williams was entitled to buy, *see* Reply at 6, or reject orders, which it was entitled to do, *see* Br. at 16.

However, there is no allegation that Wakefern "amended" the products contained on Appendix 1 to exclude the private-label products, and the 2019 Supply Agreement provided by Village in support of its motion contains no such amendment. *See* 2019 Supply Agreement. Regardless, it is not clear that a provision that authorizes amendments "from time to time," or the order procedure that allows Wakefern to reject an order, permit Wakefern to wholesale anticipatorily reject all of Morton Williams's orders for private-label products for the duration of the contract. Under Village's broad interpretation of the contract, Wakefern essentially has an unfettered right to terminate the contract at will by "amending" Appendix 1 to delete all products or deny all future orders. Such an interpretation is difficult to reconcile with the particularized termination language in the contract.

Moreover, it is unclear how these provisions square with the definition of "Wakefern Product(s)" that includes "each and every product sold or offered for sale by Wakefern," *id.* § 1(g), and the language in Appendix 1 that states that "Wakefern will . . . arrange for delivery of all Products . . . set forth . . . below" and that "Wakefern will supply" certain products, *id.*, Appendix 1 §§ 1, 2. At this juncture, and construing all inferences in Plaintiff's favor, the Court cannot conclude the language of the 2019 Supply Agreement unambiguously demonstrates that there can be no breach of contract on the facts alleged. *See Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 635 (S.D.N.Y. 2007) ("Contract language is ambiguous when it is 'capable of more than one meaning when viewed, objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is

cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (quoting *Seiden Assoc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992))).[2]  Accordingly, the Court concludes that, at this stage, dismissal for failure to allege a breach of contract is inappropriate.  *See Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.").[3]

## II.    Tortious Interference with Economic Relations and Prospective Economic Relations

Morton Williams next brings a claim for tortious interference with economic relations and prospective economic relations, alleging that it had an economic relationship with Wakefern under which Wakefern supplied it with private-label products that was anticipated to continue upon contract renewal in May 2024 and thereafter, absent Village's wrongful interference.  *See* Compl. ¶¶ 96-98.  Village contends that the claim for tortious interference with business relations and prospective business relations must be dismissed because Morton Williams failed

---

[2] The Court does not find persuasive Village's argument that the tortious interference claim must be dismissed because the Complaint does not specifically identify the provisions of the 2019 Supply Agreement that were breached.  *See* Br. at 15.  Unlike in *Wolff v. Rare Medium, Inc.*, cited by Village, where the plaintiff failed to even establish that a valid contract existed, 201 F. Supp. 2d 490, 498 (S.D.N.Y. 2002), here, Morton Williams has undisputedly pleaded a valid contract with Wakefern and has also pleaded Wakefern's obligations to sell Morton Williams private-labeled products, which was allegedly breached by Wakefern's refusal to continue selling those products to Morton Williams.

[3] To the extent that Morton Williams is arguing that Village tortiously interfered with the 2019 Supply Agreement because it intentionally and improperly procured a breach of Wakefern's implied covenant of good faith and fair dealing that is inherent in every contract, Opp. at 15, the Court will not evaluate that argument now.  Whether a tortious interference with contract claim can be maintained based on an alleged breach of the covenant, rather than a breach of the express terms of a contract, is a significant question, but Morton Williams has afforded it three sentences of briefing (without citation to case law on this precise issue), and Village has not addressed it. Because Claim 1 will not be dismissed, this question can be addressed later on proper briefing.

to allege that Village acted with a wrongful purpose or wrongful means; rather, Village acted in its own self-interest. *See* Br. at 16-18. The Court agrees.

To allege a claim for tortious interference with business relations, a plaintiff must plead that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 195 (S.D.N.Y. 2011) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)). A claim for tortious interference with prospective business relations similarly requires pleading that the defendant acted for a wrongful purpose or used improper means. *See GS Plasticos Limitada v. Bureau Veritas*, 931 N.Y.S.2d 567, 568 (1st Dep't 2011). This is a different, and more stringent, standard than a claim for interference with a binding contract because "a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the 'competing interest of the interferer,' as well as the broader policy of fostering healthy competition." *Catskill Dev., L.L.C.*, 547 F.3d at 132 (internal citations omitted). Therefore, when a plaintiff is alleging interference with a nonbinding or future relationship, he or she must show that the defendant's conduct was "more culpable" than in a case involving interference with a contract. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189-90 (2004). That is, "the defendant's conduct must amount to a crime or an independent tort," or, the defendant must have engaged in the conduct "for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* at 190 (internal citations omitted); *see also Scutti Enters., LLC v. Park Place Ent. Corp.*, 173 F. App'x 75, 76 (2d Cir. 2006) (observing that, after *Carvel*, a plaintiff must show either that the defendant's economic pressure "amounts to 'a crime or an independent tort,'" or was conducted "for the sole purpose of inflicting

intentional harm on plaintiffs" (quoting *Carvel Corp.*, 3 N.Y.3d at 190)).  Economic pressure alone may only be sufficient "wrongful means" if it is "extreme and unfair."  *See Carvel Corp.*, 3 N.Y.3d at 192 (internal citation omitted).

In *Carvel*, the New York Court of Appeals considered whether an ice cream retailer tortiously interfered with the business relationships between its franchisees and their customers when the retailer decided to sell its product in supermarkets.  *Id.* at 187-88.  The franchisees argued that "Carvel distributed its products through competitive channels, to an extent and in a way that was inconsistent with the franchisor-franchisee relationship."  *Id.* at 193.  The Court noted, however, that the franchisor-franchisee relationship "does not preclude all competition," and is generally governed by the parties' contract – not torts.  *Id.*  Nothing in Carvel's actions amounted to "extreme or unfair" economic pressure, thus precluding a cause of action.  *See id.* at 192-194.  In articulating the general standards that courts should apply when considering tortious interference claims under New York law, the court noted that "[t]he existence of competition may often be relevant," when deciding whether a defendant engaged in wrongful means or purpose, "since it provides an obvious motive for defendant's interference other than to injure the plaintiff; competition, by definition, interferes with someone else's economic relations."  *Id.* at 191.  But "[w]here the parties are not competitors, there may be a stronger case that the defendant's interference with the plaintiff's relationships was motivated by spite."  *Id.*

That logic applies here.  Morton Williams alleges that Village "decided to use its economic leverage over Wakefern to cause it to breach" the 2019 Supply Agreement, in order "[t]o crush . . . competition from Morton Williams."  Compl. ¶ 63.  It alleges that, after Village bought the Gourmet Garage and Fairway stores in Manhattan, those stores struggled through the pandemic.  *See* Compl. ¶¶ 51-56.  But Morton Williams, which was selling the Wakefern

private-label products, was thriving.  *Id.* ¶¶ 57, 59.  In order to remove this threat, Village caused Wakefern to end its successful ongoing relationship with Morton Williams to remove them as a competitor.  *Id.* ¶¶ 57-59, 62-63.  As the Court in *Carvel* explained, competition "provides an obvious motive" for Village's "interference *other* than a desire to injure" Morton Williams. *Carvel Corp.*, 3 N.Y.3d at 191 (emphasis added).  That Village was trying to compete with Morton Williams, without more specific allegations demonstrating an intent to harm Morton Williams out of spite or through wrongful means, does not permit the Court to infer it acted solely to inflict intentional harm on Morton Williams.  Rather, the only plausible inference to be drawn from these allegations is that Village was "motivated at least in part by [its] own economic interest."  *RFP LLC*, 788 F. Supp. 2d at 196; *see 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (noting that "[w]hen a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate'" (quoting *Carvel Corp.*, 3 N.Y.3d at 190-91)).  Unlike in *Clean Coal Technologies, Inc. v. Leidos, Inc.*, a case relied on by Morton Williams, there are no allegations that Village "maliciously misrepresented data," "planted false expectations," or otherwise acted in a way that would evince intentional harm.  377 F. Supp. 3d 303, 323 (S.D.N.Y. 2019).  Thus, Morton Williams has not pleaded that Village acted for the sole purpose of inflicting intentional harm on Morton Williams.

Moreover, the allegations do not plausibly allege that Village exerted wrongful means through "extreme and unfair" economic pressure.  As other courts in this Circuit have acknowledged, "there remains a dearth of concrete guidance regarding what kind of economic pressure – other than those actions which amount to a crime, an independent tort, or which are committed 'for the sole purpose of inflicting intentional harm on plaintiff' – constitutes

'wrongful means.'"  *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d

329, 345 (S.D.N.Y. 2008).  Morton Williams, relying on *Scutti Enterprises, LLC. v. Park Place*

*Entertainment Corp.* (*Scutti I*), 322 F.3d 211, 217 (2d Cir. 2003), argues that Village exerted

economic pressure on Wakefern that was "unrelated to its legitimate business interest in

promoting Wakefern's interests."  Opp. at 18 (internal quotation marks and citation omitted).

The Court is not convinced that Morton Williams is properly applying *Scutti I*'s holding.  In

*Scutti I*, the Second Circuit held that "economic pressure unrelated" to the business in which the

plaintiff and defendant compete could constitute wrongful means.  *See Scutti I*, 322 F.3d at 217;

*Darby Trading Inc.*, 568 F. Supp. 2d at 344 (observing that in *Scutti I* the Second Circuit held

that "[o]nly if the [economic] pressure is unrelated to the parties' common business will the court

entertain a finding of wrongful means").  Contrary to Morton Williams's argument, Village's

legitimate business interest in private-label products is certainly related to Morton Williams's

interest in the same.  *See, e.g.*, *Darby Trading Inc.*, 568 F. Supp. 2d at 344 (concluding that the

"direction to [a third party] to cease purchasing [the product] from [the plaintiff] . . .  surely

relate[s] to the common business pursued by" the parties").

In any event, as Village points out, the Second Circuit's decision in *Scutti I* predates the

*Carvel* decision from the New York Court of Appeals.  *See generally Carvel Corp.*, 3 N.Y.3d

at 192.[4]  And the *Carvel* Court made clear that, for economic pressure to constitute "wrongful

means," it must be "egregious" or "extreme and unfair."  *See id.* at 192-94.  Nothing in the

Complaint rises to this high level of economic pressure, or otherwise meets the "high bar" for

---

[4] To the extent that *Scutti I* compels a different result than reached here, the Court declines to
follow that opinion in light of *Carvel*.  *See Advanced Glob. Tech. LLC v. Sirius Satellite Radio,*
*Inc.*, 836 N.Y.S.2d 807, 811-12 (N.Y. Sup. Ct.), *aff'd as modified*, 843 N.Y.S.2d 220 (1st Dep't
2007).

wrongful conduct. *16 Casa Duse, LLC*, 791 F.3d at 262. Morton Williams's conclusory allegations that Village's conduct was "egregious" or "unfair" or "in bad faith" do not permit an inference to the contrary. In fact, the allegations that Village was acting as a member of Wakefern (unlike Morton Williams), suggest that the conduct was not so "extreme and unfair" as to be wrongful conduct. *See* Compl. ¶¶ 2, 7, 88. "Cases in which courts have found economic pressure sufficiently alleged typically involve what amount to strongarm tactics or a threat of negative consequences should the third party not accede to the defendant's demands." *Corning Inc. v. Shenzhen Xinhao Photoelectric Tech. Co.*, 546 F. Supp. 3d 204, 217 (W.D.N.Y. 2021) (collecting cases). There are no such specific allegations here.

In sum, Morton Williams fails to allege that Village was solely motivated to inflict intentional harm on Morton Williams, or that its conduct was so egregious that it constituted "a crime or independent tort," "extreme and unfair economic pressure," or otherwise wrongful conduct. Accordingly, Morton Williams's claim for tortious interference with economic relations and prospective economic relations is dismissed.

## III.    Unfair Competition

Morton Williams's third claim for unfair competition alleges that Village has misappropriated Morton Williams's "skills, expenditures, labors, commercial advantages, benefits and goodwill" by making it impossible for Morton Williams to continue selling Wakefern's private-label products in order to facilitate sales by Village without competition. Compl. ¶¶ 105-107. Village argues that Morton Williams's claim for unfair competition under New York law must be dismissed because Morton Williams has failed to specify what was misappropriated, and, assuming that the misappropriation relates to Wakefern's private-label products, Morton Williams cannot state a claim for misappropriation of goodwill associated with a trademark that it does not own. *See* Br. at 18-19. The Court agrees.

New York law recognizes two "theories" of common law claims for unfair competition: palming off and misappropriation. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). Palming off involves the sale of "'the goods of one manufacturer as those of another,' while misappropriation 'usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property.'" *Red Mountain Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 181 (S.D.N.Y. 2021) (quoting *ITC Ltd.*, 9 N.Y.3d at 476, 478). Morton Williams makes no allegations that invoke a "palming off" theory of unfair competition. Therefore, the question is whether it has stated a claim under a misappropriation theory.

"While courts have noted that the misappropriation theory of unfair competition is 'broad and flexible,' it is nevertheless limited to instances where a defendant took 'the skill, expenditures and labors' of plaintiff in bad faith and employed it for 'its own commercial advantage.'" *Id.* (quoting *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)). Put another way, "when a business . . . possesses goodwill constituting property or a commercial advantage in this state, that goodwill is protected from misappropriation under New York unfair competition law." *ITC Ltd.*, 9 N.Y.3d at 479. Typical, and illustrative, examples of unfair competition claims include: "when a defendant takes a plaintiff's customer list and uses it to divert business away from plaintiff and to defendant, or when a defendant obtains access to a plaintiff's proprietary technology for a mobile ticketing platform as part of a potential partnership effort to win bids from mass transit agencies and then uses that proprietary information to submit its own bid while freezing plaintiff out of the transaction." *Red Mountain Med. Holdings, Inc.*, 563 F. Supp. 3d at 181-82 (internal citations omitted).

Morton Williams contends that it has stated a claim for unfair competition because it has alleged that, "by investing in and promoting the connection between its stores and Wakefern's high-end private-label products for over 14 years, Morton Williams developed a valuable asset that Village misappropriated – namely, the goodwill of Morton William[s] with its Manhattan customers, who 'had come to think of Morton Williams as the place to buy Wakefern Private-Label Products.'" Opp. at 21 (quoting Compl. ¶¶ 49, 62-62, 106-107). Village argues that any goodwill Morton Williams may have generated is associated with trademarks in Wakefern's private-label products, not some other amorphous goodwill that Morton Williams developed with its customers. *See* Reply at 8. Village is correct.

Morton Williams's invocation of allegedly misappropriated "property" or "commercial advantage" rings hollow because the only property or commercial advantage at issue in the pleadings involves a trademark (for the ShopRite brand, owned by Wakefern), and Morton Williams cannot assert a claim for misappropriation of goodwill associated with Wakefern's trademark. *See Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 632 F. Supp. 3d 471, 481-82 (S.D.N.Y. 2022) (explaining that goodwill associated with a trademark "inures" to the owner). Per the 2019 Supply Agreement, Morton Williams agreed that, in order to use Wakefern's intellectual property – including any trademark – it needed the express prior written consent of Wakefern, unless the agreement already provided for such use. *See* 2019 Supply Agreement § 15. The agreement also gave Morton Williams a "revocable, royalty-free, non-excusive, and non-transferable right and license, to display Wakefern IP on or as part of signage at its retail stores and to use Wakefern IP in advertisements and promotions of its retail services and goods," provided displays and advertisements are subject to prior written approval. *Id.* § 16. Thus, the goodwill that Morton Williams invested in and promoted (which it characterizes only in its

opposition brief, and not its Complaint, as some "connection between its stores and Wakefern's high-end private-label products"), flows from the property being sold: the Wakefern product and its associated licensed trademark.  Opp. at 21; *see Twentieth Century Fox Film Corp. v. Marvel Enters., Inc*., 277 F.3d 253, 259 (2d Cir. 2002) ("It is clear that use of a mark by a person while such person was a licensee builds up no rights in the mark as against the licensor." (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:52 (4th ed. 2001))); *see also* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18.52 (5th ed. 2023) ("A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires no ownership rights in the mark itself.").  To be sure, if Morton Williams had alleged that its own trademark was part of the property at issue, the result here may be different. But it does not.

Morton Williams responds that this case is not a trademark case, but even non-trademark cases support the aforementioned conclusion.  In *Miller v. Walters*, the court examined an unfair competition claim by a sports management firm and its owner, against competitors and related entities, including a basketball division.  997 N.Y.S.2d 237, 240 (Sup. 2014).  The plaintiffs alleged that the defendants misappropriated their "labor, skill, and expenditures" when, after they "expended time and effort for 1½ years in order to secure a lucrative second contract for [a client]," the defendants "misappropriated the fruits of [the] plaintiffs' efforts" by signing the client.  *Id.* at 245-46.  The court recognized that:

> [The plaintiffs'] claim distills down to a claim for ownership, at least in part, of [the client] Sanders' accomplishments in his second and third seasons in the NBA.  Plaintiffs contend that their efforts are reflected in Sanders' achievements and that Defendants "took" Sanders so to benefit financially from those achievements. Such a claim is far afield from a proper misappropriation claim, since Plaintiffs of course do not contend Sanders was their "property" . . . .

25

*Id.* at 246. Similarly, here, Morton Williams contends that it invested and promoted Wakefern's private-label products for 14 years, and then Village, essentially, misappropriated the "fruits" of those efforts. But the trademark and branding of those products – like Sanders, the client in *Miller* – are not Morton Williams's property.

Nor is this a case where Village misappropriated a commercial advantage in exclusive rights to Wakefern's brand or products. In *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, the First Department concluded that Macy's had stated a claim for unfair competition when the defendant, with knowledge of "Macy's commercial advantage as the exclusive distributor of branded products," induced the owner of those products to breach its agreement with Macy's. 6 N.Y.S.3d 7, 13 (1st Dep't 2015). Here, unlike in that case, Morton Williams did not have any special commercial advantage as the exclusive distributor of Wakefern's private-label products. As such, any goodwill associated with the Wakefern products inured to Wakefern, their trademark owner.

Because Morton Williams has not alleged a claim for misappropriation of its own property right or commercial advantage, the Court concludes that Morton Williams has failed to allege a claim for unfair competition. *See, e.g.*, *Red Mountain Med. Holdings, Inc.*, 563 F. Supp. 3d at 182 (dismissing claim for unfair competition where the plaintiff's "theory of liability [did] not suggest that defendants 'reaped where they have not sown' by taking [the plaintiff's] information or property and then employing it to compete with [the plaintiff] in the marketplace" (quoting *Roy Exp. Co.*, 672 F.2d at 1105)).

## IV.    Unjust Enrichment

Plaintiff next brings an unjust enrichment claim, alleging that Village was unjustly enriched by ensuring that its own stores could sell the Wakefern private-label products without

competition from Plaintiff.  *See* Compl. ¶ 115.  Village argues that Morton Williams has failed to state a claim for unjust enrichment for largely the same reasons that its unfair competition claim fails and also because Plaintiff has not alleged that Village received a "cognizable benefit."  Br. at 20-21.  The Court agrees.

"The basic elements of an unjust enrichment claim in New York require proof that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what the plaintiff is seeking to recover."  *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)) (alterations adopted).  While "[t]he basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff, . . . unjust enrichment is not a catchall cause of action to be used when others fail."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (internal citation omitted).  Rather, the cause of action "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," such as where "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."  *Id.*; *see also In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 222 (S.D.N.Y. 2019).  "Notably, in order to state an unjust enrichment claim, a plaintiff must show that the defendant actually received a benefit[,] . . . [which] must be both 'specific' and 'direct.'" *Regnante v. Sec. & Exch. Offs.*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

Morton Williams alleges that Village has been unjustly enriched because it "now will be able to expropriate Morton Williams customers who had become loyal to the Wakefern labels as

a result of Morton Williams' investments and labor," and it will "be able to charge higher prices for Wakefern private-label products in its Manhattan Fairway stores because it will no longer face the competition of Morton Williams in selling those products."  Compl. ¶ 83; *see id.* ¶¶ 116-117.  Morton Williams does not allege that its customers actually switched to Village's stores, or that Village charged higher prices for the Wakefern private-label products.  Thus, Plaintiff's allegations are too nebulous and speculative to plausibly allege that a "specific" and "direct" benefit was received by Village.  *See Regnante*, 134 F. Supp. 3d at 773 ("An allegation premised on an unnamed benefit that may accrue in the future, however, is too slender a reed on which to premise a claim of unjust enrichment."); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 259 (S.D.N.Y. 2012) (finding unjust-enrichment claim "premature at best" where enrichment had not yet occurred).[5]

The real thrust of Morton Williams's allegations, and the only non-speculative benefit Village is alleged to have received (and that Morton Williams is alleged to have lost), is the right to sell Wakefern's private-label products without competition.  That right is the subject of the 2019 Supply Agreement, to which Village has been alleged to have tortiously interfered.  *See* Discussion § I.  Indeed, "[v]irtually all of the facts that could conceivably suggest that 'equity and good conscience require Defendants to make restitution' are facts that are alleged to

---

[5] The cases relied on by Morton Williams are not persuasive here.  In *Nanjing CIC International Co. v. Schwartz*, at summary judgment, the court addressed only the parties' arguments with respect to whether the unjust enrichment claim was duplicative of a contract claim.  No. 20-cv-07031 (EAW), 2022 WL 170606, at *7 (W.D.N.Y. Jan. 19, 2022).  And in, *Westhampton Classic Cars, LLC v. Automobili Lamborghini S.p.A.*, the court held that "it is sufficient that [the p]laintiffs allege that they expended money to improve [the defendant's] goodwill."  No. 08-cv-03247 (SJF) (ARL), 2009 WL 10709168, at *6 (E.D.N.Y. June 1, 2009), *report and recommendation adopted*, No. 08-cv-03247 (SJF) (ARL), 2009 WL 10709167 (E.D.N.Y. July 6, 2009).  Here, Morton Williams has alleged it has spent money to improve Wakefern's products' goodwill, not Village's goodwill.

constitute" the separate tort of tortious interference with contract, "charged elsewhere in the complaint." *Astor Holdings, Inc. v. Roski*, No. 01-cv-01905 (GEL), 2002 WL 72936, at *18 (S.D.N.Y. Jan. 17, 2002). "Whether any benefit obtained by [Village] at [Morton Williams's] expense by those alleged actions was 'unjust' is better assessed according to the well-established rules defining the applicable torts, rather than by free-floating notions of 'equity and good conscience.'" *Id.*; *see Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12-cv-05392 (GRB), 2015 WL 5719759, at *12 (E.D.N.Y. Sept. 29, 2015) (concluding that unjust enrichment claim was duplicative of claim for tortious interference with contract).

Even assuming, however, that some unjust enrichment has already occurred, and that the claim was not duplicative of the tortious interference with contract claim, Morton Williams has only conclusorily alleged that "[i]t would be against equity and good conscience to permit Village to retain the . . . unjust benefits." Compl. ¶ 120. Morton Williams has failed to allege "why it is against equity and good conscience to allow [Village] to retain" the alleged benefit. *FoxStone Grp., LLC v. Calvary Pentecostal Church, Inc.*, 104 N.Y.S.3d 663, 666-67 (2d Dep't 2019). Plaintiff's conclusory allegations are thus insufficient to state a claim for unjust enrichment. *See, e.g.*, *Goel v. Ramachandran*, 975 N.Y.S.2d 428, 438 (2d Dep't 2013) (dismissing unjust-enrichment claim because "the bare legal conclusion that it is against equity and good conscience to permit [the defendant] to retain this unidentified benefit is insufficient to adequately allege that the asserted enrichment was unjust"); *Coppelson v. Serhant*, No. 19-cv-08481 (LJL), 2021 WL 148088, at *10 (S.D.N.Y. Jan. 15, 2021) (dismissing unjust enrichment claim with conclusory allegations).

For all of the aforementioned reasons, the Court concludes that Morton Williams has failed to state a claim for unjust enrichment against Village.

## V.     Punitive Damages

Finally, Village argues that Morton Williams is not entitled to punitive damages based on the allegations in the Complaint.  *See* Br. at 22-23.  The Court declines to dismiss the request for punitive damages at this time.

In the context of a claim for tortious interference with a contract under New York law, "an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights." *Int'l Mins. & Res., S.A. v. Bomar Res., Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986)); *see also Purgess v. Sharrock*, 33 F.3d 134, 143 (2d Cir. 1994). The Court concludes that Morton Williams has at least alleged that Village acted with reckless disregard for its rights under the 2019 Supply Agreement.  Specifically, the Complaint contains allegations that Village knew about the 2019 Supply Agreement, knew that Morton Williams's business of selling Wakefern private-label products was "thriving," and nevertheless caused Wakefern to terminate the contract.  Compl. ¶¶ 57, 59, 71-72.  Accordingly, "[w]hether the plaintiff is entitled to punitive damages under the circumstances alleged in this complaint is a factual issue that cannot be determined on a motion to dismiss." *Cohen v. Davis*, 926 F. Supp. 399, 405 (S.D.N.Y. 1996).[6]

---

[6] The Court notes that, at least for breach of contract claims, a party must allege "not only . . . egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova v. Equitable Life Assur. Soc'y of U.S.*, 83 N.Y.2d 603, 613 (1994).  Some courts have similarly required these allegations in the context of claims for tortious interference with contract.  *See Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, No. 07-cv-07998 (HB), 2008 WL 1710910, at *7 (S.D.N.Y. Apr. 10, 2008).  Other courts have noted that, "[p]unitive damages are allowable in tort cases 'even if there is no [alleged] harm aimed at the general public so long as the very high threshold of moral culpability is satisfied.'" *Brown v. AXA RE*, No. 02-cv-10138 (LTS) (AJ), 2004 WL 941959, at *9 (S.D.N.Y. May 3, 2004) (quoting *Blank v. Baronowski*, 959 F.Supp. 172, 179 (S.D.N.Y.1997)).  The Court need not conclude there is a high threshold of moral culpability here because, to the extent such a showing is required at the pleading stage, the

## CONCLUSION

For the foregoing reasons, Village's motion is GRANTED in part and DENIED in part.

Morton Williams's second, third, and fourth claims for relief are DISMISSED.  IT IS HEREBY

ORDERED that Village shall file its answer to Morton Williams's remaining claim no later than

21 days after the date of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 17.

Dated:  September 14, 2023
        New York, New York

SO ORDERED.

*Jennifer Rochon*
_____
JENNIFER L. ROCHON
United States District Judge

---

Court finds that Morton Williams has sufficiently alleged that Village's actions were directed at
the public in preventing the public from choosing between competitors, and being provided with
a competitive market.  *See* Compl. ¶ 85